UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INDIRA FALCON, *individually and on behalf of all others similarly situated*,

    Plaintiff,

v.   Case No: 8:23-cv-02340-TPB-UAM

TELEVISAUNIVISION DIGITAL, INC.,

    Defendant.
_____/

## ORDER ON MOTION TO COMPEL ARBITRATION

This matter is before the Court on Defendant TelevisaUnivision Digital, Inc.'s "Motion to Compel Arbitration and Stay Action," filed on February 5, 2024. (Doc. 22). Plaintiff Indira Falcon filed a response in opposition on February 14, 2024. (Doc. 24). Defendant filed a reply on February 29, 2024. (Doc. 32). After reviewing the motion, response, reply, court file, and record, the Court finds as follows:

### Background[1]

This case arises under the Video Privacy Protection Act ("VPPA"). Defendant TelevisaUnivsion Digital, Inc. operates ViX.com, a Spanish-language streaming service. To view video content, Plaintiff Indira Falcon created a ViX.com account and then registered for a premium account on April 14, 2023. On each of these two

---

[1] The following facts are found in Defendant's "Motion to Compel Arbitration and Stay Action" (Doc. 22) and attached exhibits. Plaintiff does not dispute these facts. (Doc. 24).

occasions, Plaintiff "agreed" to the Terms of Use agreement requiring mandatory arbitration of most issues.

In her one-count purported class action complaint, Plaintiff alleges that Defendant violated the VPPA by disclosing her and other class members' ViX.com viewing history to Facebook via a "Meta pixel" embedded in the ViX.com website. Defendant has moved to compel arbitration of Plaintiff's claims, relying on the arbitration provision in the Terms of Use. Plaintiff argues that this arbitration agreement is unenforceable because Defendant's website did not conspicuously disclose to Plaintiff that she was agreeing to arbitration. Plaintiff therefore believes that she lacked inquiry notice of the arbitration agreement.

## Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, "embodies a liberal federal policy favoring arbitration agreements." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) (internal quotation omitted). In fact, the Eleventh Circuit Court of Appeals has "recognized that the FAA creates a presumption of arbitrability such that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (internal quotations omitted). In addition, "Florida public policy favors arbitration, and any doubts concerning the scope of an arbitration agreement should be resolved in favor of arbitration." *Dye v. Tamko Bldg. Prods., Inc.*, 275 F. Supp. 3d 1314, 1317 (M.D. Fla. 2017) (quoting

*BKD Twenty-One Mgmt. Co., Inc. v. Delsordo*, 127 So. 3d 527, 530 (Fla. 4th DCA 2012)), *aff'd*, 908 F.3d 675 (11th Cir. 2018).

"Under the FAA, a party seeking to compel arbitration must demonstrate that (a) the plaintiff entered into a written arbitration agreement that is enforceable under ordinary state-law contract principles and (b) the claims before the court fall within the scope of that agreement." *Garcia v. Church of Scientology Flag Serv. Org., Inc.*, No. 8:13-cv-220-T-27TBM, 2015 WL 10844160, at *3 (M.D. Fla. Mar. 13, 2015) (internal quotations omitted).

## Analysis

The Court must determine whether, considering these particular facts, there is a valid agreement to arbitrate. *See Adams v. Lashify, Inc.*, No. 6:23-cv-243-PGB-DCI, 2023 WL 5573822, at *2 (M.D. Fla. Aug. 29, 2023) ("The existence of a valid arbitration agreement is a threshold issue for determining the propriety of a motion to compel arbitration."). When analyzing this issue, a federal court must "'apply ordinary state-law principles that govern the formation of contracts' to determine whether there is a valid agreement to arbitrate under the FAA."[2] *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

---

[2] Although the Terms of Use contains a choice-of-law provision designating New York law, because the existence of an arbitration agreement is a question of contract formation, Florida law would most likely govern this determination. *See Dandridge v. Sherwin Williams, Inc.*, No. 8:21-cv-400-KKM-TGW, 2023 WL 2228394, at *1 n.1 (M.D. Fla. May 26, 2021). In any event, the parties themselves cite to Florida case law, so the Court will treat the choice of law issue as waived and analyze the contract issues under Florida law. This point is probably of no significance because it appears the outcome would be the same under New York law. *See Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1302 (M.D. Fla. 2018).

"In Florida, an enforceable contract requires offer, acceptance, consideration, and sufficient specification of essential terms." *Id*. (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)). For a contract to be formed, there must be "mutual assent to certain and definite contractual terms. Without a meeting of the minds on all essential terms, no enforceable contract arises." *Id*. (quoting *Matter of T&B Gen. Contracting, Inc*., 833 F.2 1455, 1459 (11th Cir. 1987))

"Contracts available on the internet come in different forms[,]" including "clickwrap" and "browsewrap" agreements. *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1302 (M.D. Fla. 2018) (citing *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 396-98 (E.D.N.Y. 2015)). Clickwrap agreements "require a user to affirmatively click a box on a website acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website." *Id*. (quoting *Berkson*, 97 F. Supp. at 397 ). Courts generally find these agreements enforceable because they "require the user to physically manifest assent," putting the user "on inquiry notice of the terms assented to." *Id*. (quoting *Berkson*, 97 F. Supp. 3d at 397).

In contrast, a browsewrap agreement "consists of a notice on a website stating that the user is agreeing to and is bound by the website's terms of service by merely using the website." *Id*. (citing *Berkson*, 97 F. Supp. 3d at 395). This notice contains hyperlinks that, when clicked, bring the user to a separate browser or window containing the full terms of the agreement. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014). Although courts examine browsewrap

agreements more closely, a browsewrap agreement may be valid even if the user never opens the terms or sees the full agreement, as long as the browsewrap agreement "give[s] at least reasonable, constructive, or inquiry notice of the website's terms to the user, and the user [ ] exhibit[s] 'unambiguous assent' to the terms." *Temple*, 360 F. Supp. 3d at 1302 (quoting *Berkson*, 97 F. Supp. 3d at 395-96). Courts employ a fact-based analysis to determine whether a user had reasonable notice of the website's terms. *Id*. "The 'conspicuousness and placement' of hyperlinks to terms, notices of the terms, 'and the website's general design all contribute to whether' an individual would have reasonable notice of a browsewrap agreement." *Id*. (quoting *Nguyen*, 763 F.3d at 1177).

Some courts, including courts in this District, have enforced "hybrid browsewrap agreements," described as "browsewrap agreements that resemble clickwrap agreements in that they require the user 'to affirmatively acknowledge the agreement before proceeding with the use of the website," often by clicking a button to create an account, sign up for a subscription, or complete an order. *Id*. at 1303-04. These hybrid agreements "weigh[] in favor of valid notice" because a user must "affirmatively acknowledge the agreement before proceeding with use of the website." *Id*. at 1303 (quoting *Nguyen*, 763 F.3d at 1176-77).

The agreements at issue here appear to be hybrid browsewrap agreements. To create an account on ViX.com, a user must enter his or her e-mail address and create a password. The following statement appears immediately between the password field and a button labeled "Create account:"

> By clicking 'Create account,' I agree to the **Terms of Use** and acknowledge that my personal information will be used in accordance with ViX's **Privacy Policy**.

Users who register for a premium account must enter their billing information and click "Subscribe." The following statement appears immediately below the billing information section and above the "Subscribe" button:

> By clicking '**Subscrib**e,' you agree to the terms above and additional subscription terms in our **Terms of Use**.

Both statements are in white font against a black background. The phrases "Terms of Use" and "Privacy Policy" are bolded but not underlined and contain hyperlinks to the respective policies. The "Create account" and "Subscribe" buttons are bright orange. Users cannot register for accounts or premium accounts without clicking the orange buttons to complete this process.

The "Terms of Use" hyperlinks linked to ViX's Terms of Use agreement. This Terms of Use agreement was in effect when Plaintiff created her account and registered for a premium subscription in April 2023. The first page of the Terms of Use agreement states in all capital letters that the agreement contains a mandatory arbitration provision. Section 21 contains the full arbitration agreement, also written in all capital letters.

In this case, Plaintiff opposes arbitration by arguing that she was not on inquiry notice of the arbitration provision. In her response, Plaintiff narrowly focuses on the font characteristics and hyperlinks to argue that the text does not sufficiently contrast with the rest of the website. As previously noted, browsewrap agreements are enforceable where the hyperlinks to a terms of use agreement are

sufficiently conspicuous. Defendant, citing several cases but relying primarily on *Adams*, argues that the ViX "Terms of Use" hyperlinks were conspicuous enough to provide Plaintiff with inquiry notice because they were placed "approximately atop and contrasting with" the orange completion buttons that Plaintiff needed to click to continue using the website.

Plaintiff argues that the cases cited by Defendant, such as *Adams*, are distinguishable from the present case because the hyperlinks were underlined, colored blue, or both. She argues Defendant "buried" the "Terms of Use" hyperlinks on its website, making this case more analogous to *Johnson v. Whaleco*, No. 5:23-cv-403-GAP-PRL (M.D. Fla. Oct. 13, 2023), *Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d 1252 (S.D. Fla. 2021), and *Valiente v. Nexgen Global, LLC*, No. 22-cv-22480-ALTMAN/Reid, 2023 WL 6213583 (S.D. Fla. Sep. 25, 2023).

Courts in this District have consistently found that a statement informing a user that by proceeding he or she consents to a set of hyperlinked terms provides sufficient inquiry notice if the hyperlinks are conspicuously placed above the button that users must click to continue. *See Derriman v. Mizzen and Main LLC*, No. 8:23-cv-1132-CEH-UAM, 2023 WL 9022723, at *7 (M.D. Fla. Dec. 29, 2023) (hyperlink placed above "GET 15% OFF" button was conspicuous enough because it was underlined and "placed directly above the sign-up button and set off from the text below it in a box of its own"); *Adams*, 2023 WL 5573822, at *4 (rejecting argument that the grey hyperlinked text in a statement should have been "bolder" and "larger" because the text was "prominent[ly] [placed]…atop and contrasting with

the dark 'CHECKOUT' button"); *Temple*, 360 F. Supp. 3d at 1304 ("Terms and Conditions" hyperlink was conspicuous enough to provide inquiry notice because it was "prominently displayed and located directly above the 'Get a Quote' button that a user click[ed] to complete his/her registration.").

Here, the "Terms of Use" hyperlinks were not buried at the bottom of ViX's webpage as those in *Whaleco, Valiente*, and *Fridman* were. The hyperlinks were included in statements that informed users they must agree to the site's Terms of Use agreement to proceed. These statements appeared immediately above the buttons that users needed to click to continue using the site, making this case analogous to *Adams*, *Derriman*, and *Temple*. The hyperlinks were printed in a white text that contrasted with both the black background and the orange "Create account" and "Subscribe" buttons, further distinguishing this case from *Whaleco*. Furthermore, although the words "Terms of Use" were not underlined, they were bolded, indicating the presence of a hyperlink. Users of the site, such as Plaintiff, therefore had sufficient inquiry notice that they were agreeing to the Terms of Use agreement by clicking "Create account" and "Subscribe."

Plaintiff also argues that Defendant was required to provide her and other users with appropriate notice that specifically described and incorporated the arbitration agreement into the Terms of Use agreement, citing to *Goldstein v. Fandango Media, LLC*, No. 9:21-cv-80466-RAR, 2021 WL 6617447 (S.D. Fla. July 27, 2021). However, *Goldstein* does not apply "because the arbitration clause in the… Terms of Use is not an incorporated collateral agreement; it is a specific

enumerated term within the . . . agreement." *See Adams*, 2023 WL 5573822, at *4 n.6; *Derriman*, 2023 WL 9022723, at *7 n.3.

Because Plaintiff had inquiry notice of ViX's entire Terms of Use agreement, including the arbitration clause, Defendant's motion to compel arbitration is granted.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) Defendant's "Motion to Compel Arbitration and Stay Action" (Doc. 22) is **GRANTED** to the extent the Court finds that Defendant may enforce the arbitration agreements in this case.

(2) This case is **STAYED** pending the completion of arbitration, and the parties are directed to notify the Court within 14 days of the resolution of the arbitration proceedings.

(3) The Clerk is directed to terminate all pending motions and deadlines, and thereafter close this case.

**DONE and ORDERED** in Chambers, in Tampa, Florida, this 29th day of March, 2024.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**